CHRISTOPHER P. RIDOUT (SBN 143931)
   christopher.ridout@zimmreed.com
BENJAMIN GUBERNICK (SBN 321883)
   Ben.gubernick@zimmreed.com
HANNAH B. FERNANDEZ (SBN 294155)
   hannah.fernandez@zimmreed.com
ZIMMERMAN REED LLP
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

DAVID N. LAKE (SBN 180775)
   david@lakelawpc.com
LAW OFFICES OF DAVID N. LAKE, APC
16130 Ventura Boulevard, Suite 650
Encino, CA 91436
(818) 788-5100 Telephone
(818) 788-5199 Facsimile

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY A. RHODEMAN and DAVID DOYLE, individually and on behalf of all others similarly situated, | CASE NO.: 5:18-CV-02363 |
| Plaintiff, | **COMPLAINT (CLASS ACTION)** |
| v. | 1. Violation of California's Unfair Competition Law |
| OCWEN LOAN SERVICING, LLC, a Delaware limited liability company, ALTISOURCE SOLUTIONS, INC.; and DOES 1 through 10, inclusive, | 2. Violation of the Racketeer Influenced and Corrupt Organizations Act |
| | 3. Violation of the Racketeer Influenced and Corrupt Organizations Act (Conspiracy to Violate) |
| Defendants. | 4. Violation of the Rosenthal Fair Debt Collection Practices Act |
| | 5. Fraudulent Concealment; |
| | 6. Money Had and Received (Restitution); and |
| | 7. Breach of Contract |
| | **(Jury Trial Demanded)** |

Plaintiffs Mary A. Rhodeman ("Rhodeman") and David Doyle ("Doyle") (collectively, "Plaintiffs") bring this Complaint, individually and on behalf of all others similarly situated, against Defendants Ocwen Loan Servicing, LLC ("Ocwen") and Altisource Solutions, Inc. ("Altisource") (collectively, "Defendants" or the "Enterprise"), and allege, upon personal knowledge as to their own actions and their counsel's investigations, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.     This class action challenges Defendants Ocwen and Altisource's fraudulent assessment and collection of unperformed, unfair, or unlawfully marked-up property valuation and inspection fees. The fees—which Ocwen habitually adds to residential mortgage loans it services—are for "Default-Related Services," i.e. services ostensibly performed when a borrower defaults on a loan.

2.     In 2009, Defendant Ocwen, a major servicer of residential mortgage loans throughout the United States, purportedly spun-off Defendant Altisource and contemporaneously entered into an exclusive contract with Altisource to provide Ocwen with Default-Related Services. Ocwen also agreed to purchase or license loan servicing software built by Altisource. Even though Altisource and Ocwen were technically and by outward appearance separate entities, on information and belief they shared common ownership, and their legal separation was in fact an artifice designed to mask the existence of the Enterprise and facilitate the imposition and collection of fees for Default-Related Services.

3.     A loan servicer can only charge a borrower for Default-Related Services in limited instances, as set out in the applicable deed of trust. Additionally, as Default-Related Services exist only to protect the lender's security interest in the property underlying the mortgage, loan servicers are prohibited from enriching themselves through Default-Related Services and making this into a profit center. In this regard, loan servicers may demand and collect no more from borrowers than the actual cost of

the Default-Related Services which are in fact performed. Typically, loan servicers contract with third-party providers—such as Altisource—which in turn hire their own vendors to perform the Default-Related Services. Additionally, loan servicers are forbidden from charging participants receiving loan modifications under the federally-funded Home Affordable Modification Program ("HAMP") any fees for property valuations.

4.      The Altisource/Ocwen Enterprise has, through self-dealing, unfairly profited from the Default-Related Services. Specifically, this case seeks recovery for the following fees that were improperly and illegally charged to borrowers and collected by the Enterprise:

(a) Fees for Broker Price Opinions ("BPO's") which were never performed but where instead different and far-cheaper Hybrid Valuations were secretly substituted in their place;

(b) Fees for Hybrid Valuations well in excess of their fair market value;

(c) Fees for property inspections which were improperly marked up and billed to borrowers at artificially inflated prices;

(d) Fees for property inspections that in actuality were never performed; and

(e) (f) Fees for property valuations performed pursuant to HAMP loan modifications in violation of HAMP regulations saying that such fees could not be assessed.

5.      These fees were automatically assessed by a computer program provided to Ocwen by Altisource, and done as part of a scheme by the Enterprise to defraud HAMP participants along with the federal government, securing for themselves not just revenue they had no right to receive, but also an unfair competitive advantage over other mortgage servicing companies.

6.      The above-described actions were performed by Defendants Ocwen and Altisource in an orchestrated effort to squeeze contractually-prohibited profits from the

provision of Default-Related Services. This scheme—which operates in the same or materially the same manner for all Class members—allows the Enterprise to extract money from unsuspecting borrowers under the guise of "reimbursement" for fees Ocwen paid to Altisource.

7.     Plaintiff does not dispute that Ocwen is entitled under the mortgage contracts to conduct Default-Related Services. Those rights are, however, not without limitation and nothing in either the contract or in law authorizes Ocwen to use the billing and collection of Default-Related Services as a vehicle for the Enterprise to covertly profit at homeowners' expense.

## THE PARTIES

8.     Plaintiff Mary A. Rhodeman ("Rhodeman") resides in Ontario, California, in the County of San Bernardino. Plaintiff is titleholder to her home located at 3213 Ashgate Way, Ontario, CA 91761 (the "Rhodeman Property"), the mortgage for which is serviced by Defendant Ocwen Loan Servicing, LLC.   The Rhodeman Property was purchased for her personal use and enjoyment and she is the borrower for a mortgage on the Rhodeman Property that is serviced by Defendant Ocwen Loan Servicing, LLC.

9.     Plaintiff David Doyle ("Doyle"), resides in Harris County, Texas. He is the titleholder of his home, located at 21027 Fernhollow Lane, Spring, Texas 77388 (the "Doyle Property"). The Doyle Property was purchased for his personal use and enjoyment and he is the borrower for a mortgage on the Doyle Property that is serviced by Defendant Ocwen Loan Servicing, LLC.

10.     Defendant Ocwen Loan Servicing, LLC ("Ocwen") is a Delaware limited liability company and wholly owned subsidiary of Ocwen Financial Corporation. Its principal place of business is located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409.

11.     Defendant    Altisource Solutions,    Inc. ("Altisource") is a    Delaware corporation and wholly owned subsidiary of Altisource Portfolio Solutions S.A. Its principal place of business is 1000 Abernathy Rd Ste 200, Atlanta, Georgia 30328.

12.     Plaintiffs do not know the true names and capacities of the defendants sued herein as DOES 1 through 10 ("DOE Defendants"), inclusive, and therefore sue said DOE Defendants by fictitious names. Plaintiffs are informed and believe and based on such information and belief allege that each of the DOE Defendants is contractually, strictly, negligently, intentionally, vicariously liable and or otherwise legally responsible in some manner for the acts and omissions described herein. Plaintiffs will amend this Complaint to set forth the true names and capacities of each DOE Defendant when same are ascertained.

13.     Plaintiffs are informed and believe and based on such information and belief allege that Defendants Ocwen and Altisource, and DOE Defendants 1 through 10, inclusive, and each of them, are and at all material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as averred herein. Each of the Defendants named herein is believed to, and is alleged to have been acting in concert with, as employee, agent, co-conspirator or member of a joint venture of, each of the other Defendants, and is therefore alleged to be jointly and severally liable for the claims set forth herein, except as otherwise alleged.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA") because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest or costs.

15.     This Court has personal jurisdiction over Defendants because Defendants are licensed to do business in California or otherwise conduct business in the State of California, a substantial portion of the wrongdoing alleged by Plaintiff Rhodeman occurred in the State of California and this District, Defendants have sufficient minimum contacts with and/or otherwise have purposefully availed themselves of the

markets of the State of California and this District such that it is fair and just for Defendants to adjudicate this dispute in this District.

16.     Venue is proper in this District because Plaintiff Rhodeman is a resident of this District and a substantial part of the events, transactions, and/or omissions giving rise to the claims asserted herein occurred in this District; and, a substantial portion of Defendants' alleged wrongdoing is believed to have occurred in this District.

## GENERAL ALLEGATIONS

17.     On March 6, 2006, Plaintiff Rhodeman purchased a home in San Bernardino County located at 3213 Ashgate Way, Ontario, CA 91761. The Rhodeman Property was purchased for Rhodeman's personal use and enjoyment. On the same day Rhodeman executed a Deed of Trust and Promissory Note, financing her mortgage with Fremont Investment & Loan. Ocwen took over the servicing of Rhodeman's home mortgage in or about September 2010. Plaintiff Rhodeman entered into a loan modification on her mortgage on October 28, 2015, that did not alter the standard terms of the mortgage contract, including those concerning Default-Related Services.

18.     On or about July 11, 2002, Plaintiff Doyle purchased a single family residence in Harris County, Texas located at 21027 Fernhollow Lane, Spring, Texas 77388.  The Doyle Property was purchased for his personal use and enjoyment. Plaintiff Doyle executed a Deed of Trust and Promissory Note also on July 11, 2002 financing his mortgage with Ameriquest Mortgage Company. Ocwen assumed the servicing of Plaintiff Doyle's home mortgage on or about March 11, 2013.

19.     Both Plaintiffs' Deeds of Trust and Promissory Notes are uniform Fannie Mae/Freddie Mac instruments and are, on information and belief, identical in all material ways to those executed by all other Class members.

## A.     DEFENDANTS' DEFAULT-RELATED SERVICES FEE SCHEME

20.     Loan servicers do not profit directly from payments made by homeowners. Instead, these companies are paid a set fee, by the lender, for their loan administration services. The loan servicing business model "encourages [loan servicers] to cut costs

wherever possible, even if this involves cutting corners on legal requirements, and to lard [sic] on junk fees and in-sourced expenses at inflated prices."[1]

21.    Under certain circumstances, loan servicers are permitted to conduct Default-Related Services in order to protect the financial interests of the loan's owner and seek reimbursement from the borrower for the fees the loan servicer incurs for Default-Related Services rendered. These fees include BPO fees, appraisal fees, and property inspection fees

22.    Uniform language in Plaintiffs and all other Class members' Deeds of Trust provides the basis for the assessment of fees for Default-Related Services. Specifically, Section 9 of the Deed of Trust proscribes steps a lender (typically through its servicer) may take to preserve its interest in the subject property. Under Section 9, any "amounts disbursed" by the servicer to a third party for Default-Related Services become additional debt owed by the borrower and secured by the Deed of Trust.

23.    Plaintiffs' and Class members' Promissory Notes also state that if there is a default with respect to "Payment of the Note Holder's Costs and Expenses," the homeowner will have to "pay back" those costs and expenses incurred in enforcing the notes to the full extent allowed by law.

24.    However, the loan servicer may not enrich itself at the borrower's expense through the provision of unnecessary, misrepresented or inflated Default-Related Services which the borrowers paid for. As alleged here, however, the Enterprise has side-stepped this prohibition by having its two constituent companies—Altisource and Ocwen—act in concert to profit from marked-up and misrepresented fees for Default-Related Services – fees for which they billed and collected from borrowers such as Plaintiffs herein.

---

[1]  Adam J. Levitin, Associate Professor of Law at the Georgetown University Law Center, in testimony to the United States House Financial Services Committee, Subcommittee on Housing and Community Opportunity, *available at* https://financialservices.house.gov/media/file/hearings/111/levitin111810.pdf (last accessed Oct. 8, 2018).

25.     Defendant Altisource, on information and belief, was until August of 2009 a wholly owned subsidiary of Defendant Ocwen that provided subcontracted mortgage related servicing assistance to both Ocwen and other servicing companies. On or about August 10, 2009, Ocwen spun-off Altisource and its parent company, Altisource Portfolio Solutions S.A. However, even though Altisource and Ocwen technically became separate companies, on information and belief they retained and maintained common ownership and management and continued to act in concert as affiliated companies with a common purpose.

26.     Shortly after, also in 2009, Ocwen entered into an agreement with Altisource Portfolio Solutions S.A., whereby Defendant Altisource became Ocwen's exclusive provider of Default-Related Services through at least 2020. Altisource has provided these services to Ocwen with respect to Plaintiffs' and Class members' loans at all relevant times.

27.     On information and belief, the exclusive arrangement between Altisource and Ocwen was designed by the Enterprise to allow Ocwen to forego obtaining Default-Related Services from less costly, equally qualified vendors, and to provide Ocwen with a partner-in-crime who would aid and abet its assessment and collection of fess for mispresented Default-Related Services.

28.     Under the terms of the Services Agreement dated August 10, 2009, Ocwen engaged Altisource to provide property valuation services. While the Services Agreement has been amended numerous times, on November 12, 2012, the executed Eighth Amendment to the Services Agreement reflects that Ocwen agreed to pay Altisource $109 for Broker Price Opinions ("BPO") and $100 for Hybrid Valuations ("Hybrid Valuation"). On July 27, 2015, a further amendment was entered into that reduced the cost of a Hybrid Valuation to $85.

29.     Under the Services Agreement, a BPO was defined as follows:
BPO – Licensed Real Estate Agent prepared product. This product includes a basic exterior inspection of the subject property, a description of the subject property's exterior condition, three comparable active listings, three

comparable sold properties and an estimated value based on normal and 30-day marketing times.

30.     Under the same Services Agreement, a Hybrid Valuation was defined as follows:

> Hybrid Valuation – This product determines an estimated value based upon adjustments of a third party automated valuation model (AVM), to reflect a Property Condition Report (prepared by PPI) and client or investor guidelines. This estimated value is also reviewed against the most recent appraisal and/or most recent prior valuation(s), if available to highlight changes or discrepancies.

31.     When home mortgage borrowers fall behind on their payments and go into "default," Ocwen obtains Default-Related Services, supposedly to protect the lender's interest in the property. Ocwen funnels the work through Altisource under its exclusive arrangement and Altisource, in turn, orders these services using a network of select third-party vendors. On information and belief, the following occur as a matter of policy and practice:

(a) Ocwen orders BPOs from Altisource and bills the homeowner accordingly. However, Altisource does not obtain a BPO but only directs its contractors to perform a Hybrid Valuation. The difference between the cost of the (performed) Hybrid Valuation and the (fraudulently billed for) BPO is retained by the Enterprise for its benefit.

(b) When homeowners are billed for a Hybrid Valuation, they are assessed a fee well above the service's fair market value.

(c) Through its software system—which Ocwen also obtained from Altisource—Ocwen automatically and periodically orders property valuations from Altisource and collects the costs of doing so from the borrower without regard for whether or not the loan is subject to a HAMP modification which forbids such fees from being collected.

(d) Ocwen orders Altisource to perform property inspections, bills the homeowner inspection fees far in excess of the actual price of those services (i.e. the price Altisource and Ocwen agreed to charge customers in the Service Agreement) and collects the inflated cost from the borrowers.

(e) In some instances, homeowners are billed for property inspections even though no service whatsoever is actually performed.

32.   Through this complex, structured arrangement with Altisource, which is intended to disguise the never-incurred, wrongfully assessed, or marked-up fees for Default-Related Services, Ocwen effectively side-steps the borrower protections in the mortgage contract and other legal prohibitions against such conduct.

### *Defendants Assess Improper Fees For Hybrid Valuations.*

33.   In 2013, Ocwen entered into a Consent Decree with the Consumer Finance Protection Bureau ("CFPB") requiring Ocwen to disclose to borrowers a schedule of all non-state specific fees (or range of fees) that it would charge to borrowers for certain Default-Related Services, including fees related to valuations. Further, Ocwen also agreed under this same Consent Decree that it would not pass on any third party fees for services to a borrower that were in excess of the current market rate for such services. In an apparent attempt to skirt the promises it made in the Consent Decree while still unfairly profiting at homeowners' expense, Ocwen (and the Enterprise) have been (a) charging BPO fees when in fact cheaper Hybrid Valuations are being done; and (b) marked-up the cost of Hybrid Valuations in excess of the fair market rate for the cost of those services.

34.   Altisource obtained and provided property valuations for Ocwen during the time period that Ocwen serviced Plaintiffs' and Class members' loans. The cost of these valuations were included on the monthly mortgage statements sent to Plaintiffs and Class members, each of whom paid such fees as part of their monthly mortgage payment.

35.     In some instances, Ocwen represented in invoices, loan comments, and other materials sent or made available to Plaintiffs and the Class members that the valuations undertaken were BPOs conducted by a licensed real estate agent/broker. In reality, however, they were not BPOs but Hybrid Valuations generated, on information and belief, through an automated process without the involvement of a licensed real estate agent/broker at all. The proceeds for this overcharge were collected by Altisource for the benefit of the Enterprise.

36.     Even when Ocwen did represent that a Hybrid Valuation was performed, it still defrauded homeowners by assessing a service fee that was marked-up well above the fair market rate for Hybrid Valuations.

37.     For example, as reflected in invoices obtained by Plaintiff Rhodeman within the last year pursuant to Qualified Written Requests for information (a "QWR"), Ocwen had "BPOs" conducted on her property on June 15, 2014, July 13, 2015, and December 16, 2016. However, copies of the actual valuations for June 2014 and December 2016 reflect automated Hybrid Valuations, not BPOs. The June 2014 and the July 2015 valuations were billed at $100 each and the December 2016 valuation at $85. Ocwen added these costs to Plaintiff Rhodeman's account balance and she paid the fees, having no way to know they were improperly assessed or misrepresented.

38.     Likewise, documentation obtained by Plaintiff Doyle pursuant to QWRs within the past year revealed Ocwen invoices suggesting that "BPOs" were performed on his property on November 21, 2013, March 31, 2014, August 13, 2014, and December 18, 2014, respectively. Again, however, the actual valuations show that, as was the case with Plaintiff Rhodeman, three of the four valuations were actually Hybrid Valuations and not BPOs.   Ocwen added these costs to Plaintiff Doyle's account balance and he paid the fees, having no way to know they were improperly assessed or misrepresented

*The Enterprise Illegally Marks Up The Cost Of Property Inspections and in Some Instances Charges for Inspections Never Performed.*

39.     Notwithstanding that the 2013 Consent Decree precludes Ocwen from marking-up fees for third party default services, and despite the fact that its own agreement with Altisource set the price for property inspections at $13.25, Ocwen nevertheless assessed property inspection fees on Plaintiffs and on information and belief Class members' loans, in the amount of $15.[2]

40.     For example, as part of the documentation received within the last year pursuant to the above referenced QWR, it was learned that Ocwen assessed and collected property inspection fees of $15.00 from Plaintiff Rhodeman on three different occasions, July 14, 2014, August 15, 2014, and June 16, 2016.

41.     Also learned within the last year as a result of his own QWR to Ocwen, Ocwen likewise assessed and collected property inspection fees of $15.00 from Plaintiff Doyle on five different occasions, April 10, 2014, April 30, 2014, June 18, 2014, July 22, 2014, and August 16, 2014.

42.     Additionally, the same documents received as part of Rhodeman's QWR revealed that Ocwen assessed Rhodeman property inspection fees in the amount of $10.50 for June 8, 2011 and September 12, 2012, when Ocwen's loan comments reflect that these property inspections were cancelled.

43.     The fact that the contract price for Altisource to provide property inspection services to Ocwen was fixed at $13.25 reflects not only what both Ocwen

---

[2] This is not the first time that Ocwen has violated a Consent Decree by overcharging a borrower for third party fees. The recent 2017 Massachusetts Temporary Consent Order disclosed that borrowers were overcharged $6.2 million in 2014 for property inspections carried out by vendor Altisource Portfolio Solutions, S.A. (Altisource) when it increased inspection fees to the maximum GSE allowable amount, which in some cases exceeded the amounts contractually agreed upon in the statement of work. Ocwen agreed to pay 30 percent ($1.9 million) of the $6.2 million refund and Altisource the remaining 70 percent ($4.3 million). *See* Mass. Consent Order at ¶ 20, *available at* https://www.mass.gov/temporary-order-to-cease-and-desist/ocwen-loan-servicing-llc.

and Altisource believed to be the standard for what is reasonable and customary for such inspections, but also that they knowingly were charging and collecting more from borrowers like Plaintiffs. At the same time, this contracted rate suggests that Ocwen's billing Plaintiffs, and on information and belief Class members, for such inspections at the over-contract rate of $15.00 is outside what is appropriately passed on to the borrower under Section 9 of Plaintiffs' and other Class members' Deeds of Trust.

### The Enterprise Uses Software To Defraud The Government And Homeowners

44.    On information and belief, Ocwen's default servicing software—a platform licensed from Altisource—is designed and programmed to automatically order property valuations periodically without regard for whether or not a particular loan is subject to a HAMP modification. Plaintiff Rhodeman and other Class members were subject to this systemic and nationwide practice whereby Ocwen wrongfully assessed and collected property valuation fees from borrowers as part of the HAMP loan modification process.

45.    For example, at the time of the July 13, 2015 valuation on her home, Plaintiff Rhodeman was being reviewed for a modification under HAMP. Plaintiff Rhodeman was approved by Ocwen for a trial payment plan in August 2015 and her permanent modification was put in place in November 2015. Then-existing HAMP guidelines and regulations, specifically Section 9.3.3 which governs "Administrative Costs," precluded Ocwen from charging for any administrative processing costs incurred in connection with a HAMP modification, including property valuation fees. Ocwen, however, still billed Plaintiff Rhodeman for the valuation service and was paid for that service by Plaintiff Rhodeman.

46.    These valuation service fees which were both not legally collectible in some instances and in excess of the true cost of services in other instances, were invoiced to Plaintiff Rhodeman and added to the total amount due under her mortgage. To become current on her mortgage, Plaintiff Rhodeman, as well as all other Class

members, were required to pay the inappropriate, inflated and marked-up fees, doing so as part of their payments to Ocwen, thereby suffering actual and quantifiable harm.

47.    On information and belief, at all relevant times Ocwen and Altisource were fully aware of the prohibition against charging fees to homeowners obtaining loan modifications under HAMP. Further, on information and belief, this imposition of fees by the Ocwen/Altisource software system is a feature, not a bug. By information and belief, the Enterprise's agents intentionally designed and programmed the system to generate these fees and omitted any programming rules or codes that would prevent HAMP loan modification participants from being assessed such fees.

48.    On information and belief, the federal government would not provide Ocwen with HAMP funding if it knew that Ocwen intended to assess Default-Related Services fees to HAMP loan modification participants.

49.    Based on the forgoing, Plaintiffs were forced to retain counsel and file this class action lawsuit seeking monetary, declaratory and injunctive relief for the defined Class. As Plaintiffs still own their homes, they remain subject to Defendants' unlawful practices, described and challenged herein, in the future. Further Defendants' unlawful conduct is capable of repetition evading review if this matter does not go forward.

50.    As of this filing, Plaintiffs have not received any "refund" or payment from any Defendants by check, electronic transfer, bank wire, or any other means.

51.    On July 31, 2018, Plaintiff Rhodeman sent a notice letter pursuant to Sections 20 and 15 of her Deed of Trust to Ocwen and Fremont Investment, each of whom is designated as "lender" in at least one location in her loan documents, including her 2015 loan modification. To be clear, as confirmed by the allegations of this Complaint, Plaintiff Rhodeman does not contend, and, indeed, affirmatively denies, that Ocwen is the lender of her mortgage loan. However, out of an abundance of

caution, and in light of the noted confusion, Plaintiff Rhodeman sent notice of her grievances to all entities identified as "lender."3

## CLASS ALLEGATIONS

52.     This action is brought as a class action and may properly be so maintained pursuant to Fed. R. Civ. P. 23 and other applicable rules of civil procedure. This action seeks recovery of actual damages, restitution, injunctive and equitable relief arising from Defendants' unfair business practices.

53.     Class Definitions: Plaintiffs seek to represent a class in this action defined as follows:

> All borrowers in the United States subject to a mortgage loan serviced by Ocwen who were charged more than $13.25 for a property inspection or were charged a fee for property valuations while in a HAMP loan modification or were charged for a BPO when in fact a Hybrid Valuation occurred or were charged for a Hybrid Valuation in an amount exceeding the fair market rate (the "Class").

54.     Plaintiff also seek to represent a sub-class initially defined as:

> All borrowers in California subject to a mortgage loan serviced by Ocwen who were charged more than $13.25 for a property inspection or were charged a fee for property valuations while in a HAMP loan modification or were charged for a BPO when in fact a Hybrid Valuation occurred or were charged for a Hybrid Valuation in an amount exceeding the fair market rate (the "California Subclass").

55.     The Class Period dates back four years (or the length of the longest applicable statute of limitations for any claim asserted) from the date this action was originally filed. Excluded from the Class are: (a) any officers, directors or employees of the Defendants; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case.

---

3 Ocwen responded to the correspondence on August 13, 2018. Ocwen's letter confirmed receipt of the July 31, 2018 correspondence and its capacity as servicer, not lender of Plaintiff Rhodeman's mortgage loan.

56.     Plaintiffs reserve the right to modify or amend the above-referenced definitions before the Court determines whether certification is appropriate.

57.     Defendants subjected Plaintiffs and Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner. The conduct described above is the Defendants' standard business practice.

58.     **Numerosity of the Classes.** Members of the Classes are so numerous that their individual joinder herein is impracticable. The Defendants service thousands of mortgage loans in California and nationwide. The individual Class members are ascertainable as the names and addresses of all class members can be identified in the business records maintained by Defendants. The precise number of members of the Classes certainly numbers in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint and impractical for each to bring suit individually. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

59.     **Ascertainable Classes.** The proposed Classes are ascertainable. The litigation of the questions of fact and law involved in this action will resolve the rights of all members of the Classes and hence, will have binding effect on all Class members. These Class members can be readily identified from business records, billing systems, and telephone records of the Defendants and other means readily available to the Defendants, and thus by the Plaintiff, through minimally intrusive discovery. The Classes are numerous. Joinder of all Class members is impracticable due to the relatively small monetary recovery for each Class member in comparison to the costs associated with separate litigation and likelihood that due to the nature of the lender-placed insurance that Class members faced they may have when initially contacted Defendants, Class members are likely in poor financial situations.

60.     **Commonality.** There are questions of law and fact that are common to the Plaintiffs and Class members' claims. These common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only

individual members of the class. Among such common questions of law and fact are the following:

    a.    Whether Defendants violated the UCL by failing to disclose that they charged inflated, marked-up prices for property inspections and valuations;

    b.    Whether Defendants violated the UCL by violating state and federal laws;

    c.    Whether Defendants violated Title 18 U.S. Code 1692 *et seq.*;

    d.    Whether Ocwen violated the Rosenthal Act by failing to disclose the true nature of the debt it attempted to or did collect from Class members;

    e.    Whether Defendants fraudulently concealed unlawfully assessed and marked-up fees on Plaintiffs and other Class members;

    f.    Whether Ocwen breached its mortgage agreements with Plaintiffs and the Class by charging them inflated, marked-up prices for property inspections and valuations;

    g.    Whether Plaintiffs and Class members are entitled to damages and/or restitution and the proper measure of that loss;

    h.    Whether Defendants were unjustly enriched by their conduct;

    i.    The appropriateness and proper form of any declaratory or injunctive relief; and

    j.    The appropriateness and proper measure of monetary and other damages sustained by the Class.

61.    **Typicality**. Plaintiffs are typical members of the Classes and their claims are typical of the claims of members of the Classes. Typical of other Class members, Plaintiffs were charged marked-up, mispresented, or otherwise improper fees for Default-Related Services during the Class Period. Plaintiffs and the Class members each sustained, and will continue to sustain, damages arising from Defendants' common and uniform course of wrongful conduct, as alleged more fully herein. Plaintiffs' claims are founded on the same legal theories as those of the Class.

62.    **Adequacy of Representation.** Plaintiffs will fairly and adequately represent and protect the interest of the members of the Classes. Plaintiffs are

committed to the vigorous prosecution of this action and have retained counsel competent and experienced in the prosecution of complex class actions involving consumer fraud, including fraud related to mortgage servicing. Plaintiffs have no interests contrary to the other Class members, and will fairly and adequately protect the interests of the Class.

63.   To prosecute this case, Plaintiffs have retained the law firms of Zimmerman Reed, LLP, and the Law Offices of David N. Lake, APC. These firms have extensive experience in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

64.   The questions of law or fact common to Plaintiffs and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiffs and the unnamed Class members are based on the over-charging of default-related services fees that Defendants unlawfully secured through a common and uniform course of misconduct.

65.   Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

66.   **Superiority of Class Adjudication.** The certification of a class in this action is superior to the litigation of a multitude of cases by members of the putative class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are Class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue Defendants and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the Class members in relation to the benefits received. The damages, restitution and other potential recovery for each individual member of the Class are modest, relative to the substantial burden and

expense of individual prosecution of these claims. Given the amount of the individual class members' claims, few, if any, Class members could afford to seek legal redress individually for the wrongs complained of herein. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

67.     In the alternative, the above-referenced Classes may be certified because:

a.     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendants;

b.     The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and,

c.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

## **FIRST CLAIM FOR RELIEF**

### **Violation of the Unfair Competition Law,**

### **Cal. Bus. & Prof. Code § 17200 *et seq*.**

(By Plaintiff Rhodeman against All Defendants on Behalf of the California Class)

68.     Plaintiff Rhodeman incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

69.    Plaintiff Rhodeman brings this claim individually and on behalf of the Classes and Sub-Classes pursuant to section 17200 *et seq.* of the Business & Professions Code, the Unfair Competition Law ("UCL") against Defendants.

70.    California's UCL prohibits unfair competition, which includes any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200 *et seq.*

71.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

72.    Defendants committed, and continue to commit, "unlawful" business acts or practices by, among other things, violating the Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO Act"), and California's Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal. Civ. Code section 1788 *et seq.*

73.    As described above, by misrepresenting Hybrid Valuations as BPOs, and by failing to disclose the existence and amount of marked-up Default-Service Fees, and by falsely claiming that property inspections occurred when in fact no service was performed, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code section 1788.10 *et seq.*, by, among other things: (a) misstating the character, amount or legal status of the debt they collected or sought to collect from Plaintiff and Class members; (b) using false representations or deceptive means to collect or attempt to collect the debt from Plaintiff and Class members. Plaintiff Rhodeman and the Class members suffered actual harm in that these marked-up default-service fees were paid by them to Defendants.

74.    As described above, Defendants' conduct is unlawful in that it violated the RICO Act, which prohibits the use of income derived from a "pattern of racketeering activity" to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce; the acquisition or maintenance of any interest in an enterprise "through" a pattern of racketeering activity; conducting or participating in the conduct

1  of an enterprise through a pattern of racketeering activity; and conspiring to violate any

2  of these provisions.  18 U.S.C. § 1962.

3      75.    A business act or practice is "unfair" under the UCL if the reasons,

4  justifications, and motives of the alleged wrongdoer are outweighed by the gravity of

5  the harm to the alleged victims.

6      76.    Defendants committed, and continue to commit, "unfair" business acts or

7  practices by, among other things:  (a) engaging in conduct for which the utility of the

8  conduct, if any, is outweighed by the gravity of the consequences to the Plaintiff and all

9  other Class members; (b) engaging in conduct that is immoral, unethical, oppressive,

10  unscrupulous, or substantially injurious to Plaintiff and all other Class members; and

11  (c) engaging in conduct that undermines or violates the spirit or intent of the laws that

12  this Complaint invokes.

13      77.    Specifically, Defendants engaged in unfair business acts or practices in

14  violation of the UCL by, in the course and conduct of their loan servicing and

15  collection, knowingly, affirmatively, and actively concealing the true character, quality,

16  and nature of their assessment of marked-up default-related service fees against Class

17  members' accounts. Relying on Defendants, Plaintiff, and members of the California

18  Subclass believed they were obligated to pay the amounts specified in Ocwen's

19  communications.

20      78.    However, borrowers are not obligated to pay the amounts that have been

21  specified in Ocwen's communications concerning default-related services, including

22  Hybrid Valuations masquerading as BPOs, Hybrid Valuations that exceed the fair

23  market rate for such services, property inspection fees that exceed both the contracted

24  for amount and the reasonable market rate for such services, and the costs of  property

25  inspections when in fact no service was performed. Contrary to Ocwen's

26  communications, Ocwen is not legally authorized to assess and collect these fees, but

27  did so anyway from Plaintiff Rhodeman and the Class members. Nor may it assess and

28  collect for property inspections beyond their actual cost.

79.     These acts and practices are unfair because they caused Plaintiff and all other Class members to falsely believe that Defendants were legally owed amounts they were not owed.

80.     As to the imposition of fees to HAMP loan modification participants, Defendants' actions are further unfair in that they secure for Ocwen an improper competitive advantage over other loan servicers. Specifically, by impermissibly charging property valuation fees to HAMP loan modification participants Ocwen is defrauding borrowers like Plaintiff Rhodeman (as well as the federal government because access to HAMP funds is contingent on compliance with certain rules, including the non-assessment of fees). Ocwen, by taking the federal funds and charging and collecting from borrowers these improper property valuation fees improperly granted itself an unfair competitive edge (in the form of inflated revenue) over loan servicers that abide by the rules and refrain from defrauding the borrowers as well as the government in this fashion.

81.     Finally, Defendants' actions are unfair in that they violate the Consent Decree Ocwen entered into with the Consumer Financial Protection Bureau in 2013.

82.     The UCL also prohibits any "fraudulent business act or practice." A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

83.     Ocwen's concealment of material facts, as set forth above, was false, misleading, or likely to deceive the public within the meaning of the UCL. Ocwen's concealment was made with knowledge of its effect, and was done to induce Plaintiff Rhodeman and members of the California Subclass to pay the marked-up, misrepresented, or otherwise improper service fees.

84.     Plaintiff Rhodeman and members of the California Subclass relied on their reasonable expectation that Ocwen would comply with the disclosures set forth in the mortgage agreement, Notes, and Deeds of Trust, and as a result, Plaintiff Rhodeman and members of the California Subclass relied on Ocwen's disclosures about the fees

1  on their statements, reasonably believing the default-related service fees to be valid

2  charges that legitimate as well as ones that were not improperly marked-up.

3      85.    Indeed, to prevent borrowers from challenging Ocwen's unlawful fee

4  assessment, Ocwen concealed the scheme from borrowers by telling them, in

5  statements and other documents, that such fees were in accordance with the terms of

6  their mortgage. Had the true nature of the fees been disclosed to Plaintiff Rhodeman

7  and the members of the California Subclass, they would have been aware of the mark-

8  ups and Plaintiff Rhodeman and the members of the California Subclass would have

9  disputed the charges and not paid them.

10     86.    The gravity of harm to Plaintiff Rhodeman and Class members resulting

11  from these unfair acts and practices outweighed any business justifications for

12  Defendants' deceptive acts and practices. By committing the acts and practices alleged

13  herein, Defendants engaged in unfair business practices within the meaning of the

14  UCL. Such acts and violations have not abated and will continue to occur unless

15  enjoined.

16     87.    Defendants' misrepresentations, as set forth above, were false, misleading,

17  and likely to deceive the public within the meaning of the UCL.

18     88.    Plaintiff Rhodeman and all other Class members reasonably relied and

19  reasonably expected that Defendants would comply with the law, to deal honestly with

20  then and to comply with the provisions of the Rosenthal Act and RICO Act.

21     89.    Plaintiff Rhodeman and all other Class members have suffered injury in

22  fact and suffered monetary loss as a direct result of Defendants' conduct described

23  herein.  Specifically, Plaintiff Rhodeman and all other Class members have paid fees to

24  Defendants which were improper or misrepresented and have incurred and will

25  continue to incur legal fees and costs in order to prevent the wrongful loss of their

26  property.

27     90.    Under section 17203 of the UCL, Plaintiff Rhodeman and all Class

28  members are entitled to (a) restitution and disgorgement of all unjustly retained monies;

(b) equitable relief; (c) pre- and post-judgment interest at the highest rate allowable by law; (d) payment of attorneys' fees and costs pursuant to section 1021.5 of the California Code of Civil Procedure; and (e) any other relief this Court deems proper.

## SECOND CLAIM FOR RELIEF

**Violation of the Racketeer Influenced and Corrupt Organizations Act,**

**18 U.S.C. § 1962(c)**

**(By Plaintiffs Against All Defendants on Behalf of the Class)**

91.   Plaintiffs incorporate all preceeding and succeeding allegations by reference as if fully set forth herein.

92.   Defendants Ocwen and Altisource are "persons" within the meaning of Title 18 United States Code ("18 U.S. Code") section 1961(3) because they are entities "capable of holding a legal or beneficial interest in property."

93.   At all relevant times, Ocwen and Altisource, including their directors, employees and agents, as well as third party vendors, conducted the affairs of an associated-in-fact enterprise, as that term is defined in 18 U.S. Code section 1961(4) (the "Enterprise").  The "Enterprise" operated various businesses for the purpose of performing Default-Related Services. On information and belief, other currently unidentified individuals and entities are also part of the Enterprise.

94.   The affairs of the Enterprise affected interstate commerce through a pattern of racketeering activity.

95.   The Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing and/or misrepresenting assessments for unlawfully marked-up fees for Default-Related Services on borrowers' loan accounts.

96.   While the members of the Enterprise participate in and are part of the Enterprise, they also have an existence separate and distinct from the Enterprise. The Enterprise has a systematic linkage because there are contractual relationships,

agreements, financial ties, and coordination of activities between Ocwen and Altisource.

97.    Operating the Enterprise according to policies and procedures developed and established by their executives, Ocwen and Altisource control and direct the affairs of the Enterprise and use the other members of the Enterprise as instrumentalities to carry out their fraudulent scheme.

98.    These policies and procedures established by Ocwen and Altisource's executives include, but are not limited to: (1) funneling default-related services through Altisource (a *de facto* Ocwen-affiliated company) at marked-up prices in order to create an unwarranted profit center; (2) fraudulently misrepresenting the type and nature of property valuations to charge for services that had not actually been performed; (3) providing account statements that conceal the true nature of the marked-up Default-Related Service fees; and (4) defrauding the borrowers and government by using mortgage loan management software designed to assess improper fees on HAMP participants' accounts.

99.    By developing and implementing policies and procedures leading to the repeated assessment of unlawful and marked-up fees for Default-Related Services, Ocwen engaged in the conduct of the Enterprise distinct from Ocwen's own affairs as a loan servicer.

100.    The Enterprise's systematic scheme to fraudulently conceal unlawfully assessed and marked-up third party fees on the mortgage accounts of Class members (who have mortgage loans serviced by Ocwen, as described above), was facilitated by the use of the United States Mail and wire. The Enterprise's scheme constitutes "racketeering activity" within the meaning of 18 U.S. Code section 1961(1), as acts of mail and wire fraud, under 18 U.S. Code sections 1341 and 1343.

101.    In violation of 18 U.S. Code sections 1341 and 1343, the Enterprise utilized the mail and wire in furtherance of its scheme to defraud consumers whose

loans are serviced by Ocwen by obtaining money from borrowers using false or fraudulent pretenses.

102.    Through the mail and wire, the Enterprise provided mortgage invoices, loan statements, or payoff demands to Class members, affirmatively demanding that Class members pay wrongfully assessed and marked-up fees for default-related services. Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

103.    The Enterprise fraudulently and unlawfully assessed and marked-up Default-Related Service fees in violation of the disclosures made in Class members' mortgage agreements.

104.    Furthermore, to dissuade borrowers from challenging Ocwen's unlawful fee assessment, Ocwen concealed the Enterprise's scheme from borrowers by telling them, in statements and other documents, that such fees were in accordance with the terms of their mortgages.

105.    The mortgage invoices, loan statements, or payoff demands provided to borrowers disguised the fact that the Default-Related Service fees assessed on homeowners' accounts were unlawfully assessed and marked-up. By disguising the true nature and type of default services performed, as well as the amounts purportedly owed for them in communications to borrowers, the Enterprise made false statements using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers.

106.    This fraudulent concealment was material to Plaintiffs and other members of the Class. Had the Enterprise disclosed the true nature of the fees for default-related services, Plaintiffs would have been aware unlawfully assessed fees as well as of the mark-up, and would have challenged Ocwen's unlawful fee assessments or would not have paid them.

107.    Each of these acts constituted an act of mail fraud for purposes of 18 U.S. Code section 1341.

108.   Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, the Enterprise engaged in repeated acts of wire fraud in violation of 18 U.S. Code section 1343.

109.   The Enterprise's knowledge that its activities were fraudulent and unlawful is evidenced by, among other things, the fact that they misrepresented the type and status of proper valuations they performed as well as concealed the marked-up nature of the default-related service fees in their communications to borrowers.

110.   The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of 18 U.S. Code section 1961(5) in which the Enterprise have engaged under 18 U.S. Code section 1962(c).

111.   All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Enterprise racketeering enterprise. The racketeering acts committed by the Enterprise employed a similar method, were related with a similar purpose, and they involved similar participants, with a similar impact on the members of the Class.

112.   The Enterprise used numerous acts of mail and wire fraud to carry out the scheme. It would be impracticable for Plaintiffs to plead all details of the scheme with particularity, as she brings this action on behalf of all similarly situated borrowers and this information cannot be alleged without access to the Enterprise's records. At this time, Plaintiffs cannot plead the precise dates of all Enterprise uses of the mail and wire.

113.   The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

114.   Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

115.   As a direct and proximate result of these violations of 18 U.S. Code sections 1962(c) and (d), Plaintiffs and other members of the Class have suffered

substantial damages. Members of the Enterprise are liable to Plaintiffs and members of the Class for treble damages, together with all costs of this action, plus reasonable attorneys' fees, as provided by 18 U.S. Code section 1964(c).

### THIRD CLAIM FOR RELIEF

**Violation of the Racketeer Influenced and Corrupt Organizations Act,**

**18 U.S.C. § 1962(d), Conspiracy to Violate Title 18 U.S. Code § 1962(c)**

**(By Plaintiffs Against All Defendants on behalf of the Class)**

116.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

117.   As set forth above, in violation of 18 U.S. Code Section 1962(d), Defendants conspired to violate the provisions of 18 U.S. Code Section 1962(c).

118.   As set forth above, Defendants, having directed and controlled the affairs of the Enterprise, were aware of the nature and scope of the Enterprise's unlawful scheme, and they agreed to participate in it.

119.   As a direct and proximate result, Plaintiff and other members of the Class have been injured in their business or property by the predicate acts that make up the Enterprise's patterns of racketeering activity, as well as by unlawfully assessed and marked-up fees for default-related services were assessed on their mortgage accounts.

### FOURTH CLAIM FOR RELIEF

**Violation of the Rosenthal Fair Debt Collection Practices Act,**

**Cal. Civ. Code § 1788 *et seq.***

**(By Plaintiff Rhodeman Against Ocwen on Behalf of the California Subclass)**

120.   Plaintiff Rhodeman incorporates all preceding and succeeding allegations by reference as if fully set forth herein.

121.   California's Rosenthal Act prohibits creditors and debt collectors from, among other things, making false, deceptive, or misleading representations in an effort to collect a debt. Cal. Civ. Code section 1788 *et seq.*

122.   Plaintiff Rhodeman and all Class members are "debtor[s]" as that term is defined by California Civil Code section 1788.2(h). Under the Rosenthal Act, a "debt collector" is defined as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection."  *Id.* at § 1788.2(c). Ocwen is a "debt collectors" as that term is defined in California Civil Code section 1788.2(c) because it regularly sent or directed to be sent mortgage bills, communications and other notices seeking to collect money from Plaintiff and Class members and acted as the servicer of Plaintiff and Class members' mortgage loans.

123.   California Civil Code section 1788.17 provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code."  Cal. Civ. Code § 1788.17.  Thus, the Rosenthal Act incorporates the provisions of the federal Fair Debt Collection Practices Act (hereinafter "FDCPA") and a plaintiff may state a claim for violation of the Rosenthal Act by showing that a defendant violated any of several provisions of the FDCPA.

124.   Section 1692e of the FDCPA provides that a debt collector may not use any "false, deceptive, or misleading representation or means in connection with the collection of any debt including: (2) The false representation of (A) the character, amount or legal status of any debt…." 15 U.S.C. § 1692e(2)(A).  Section 1692e(10) further provides that "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt..." is conduct in violation of that Section. *Id.* at § 1692e(10).

125.   On information and belief, and as alleged herein, Ocwen knew or had reason to know that the amounts included in Plaintiff Rhodeman and other Class members' mortgage loan debt for default-related services were either unlawfully assessed marked-up, inflated, or not properly charged to Plaintiff and Class members. These unlawfully assessed and marked-up fees did not accurately represent the amount

of the debt owed by Plaintiff Rhodeman and Class members, as the debt owed for Default-Related Services is only the amount permitted by the mortgage agreement.

126.   Without disclosing the existence and amount of misrepresented property valuations and other marked-up or otherwise improper default-services fees, Defendants have engaged in debt collection activities in violation of the Rosenthal Act, California Civil Code Section 1788.10 *et seq.*, by, among other things:  (a) misstating the character, amount or legal status of the debt they collected or sought to collect from Plaintiff Rhodeman and Class members; and (b) using false representations or deceptive means to collect or attempt to collect the debt from Plaintiff Rhodeman and Class members.

127.   Plaintiff Rhodeman and all other Class members reasonably relied at the time on Defendants' representations of the character, amount, and validity of the debt allegedly owed, paying Ocwen for misrepresented property valuations and other marked-up default-services fees.

128.   Defendants' acts as described above were done willfully and knowingly within the meaning of California Civil Code section 1788.30(b).

129.   The payments demanded by Defendants on the mortgages purportedly owed by Plaintiff Rhodeman and Class members are "debt[s]" within the meaning of California Civil Code section 1788.2(d), because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

130.   As a result of Defendants' actions herein, Plaintiff Rhodeman and all other Class members have been damaged and Plaintiff, on behalf of all Class members, seek all available relief under the California Rosenthal Fair Debt Collection Practices Act. Pursuant to California Civil Code section 1788.17, Plaintiff and all other Class members are entitled to recover actual damages sustained because of Defendants' violations of the Rosenthal Act, which incorporates the FDCPA. Such damages include, without limitation, monetary losses, and damages. Additionally, because

Defendants' violations of the Rosenthal Act were committed willingly and knowingly, Plaintiff and all other Class members are entitled to recover statutory damages in the amount of $1,000 for each violation. *See* Cal. Civ. Code § 1788.17 and 15 U.S.C. 1692k(a)-(c).

131.   Pursuant to California Civil Code section 1788.17 and section 1629k of Title 15 of the United States Code, Plaintiff Rhodeman, on behalf of the Class, is entitled to recover all attorneys' fees, costs, and expenses incurred in the bringing of this action.

## FIFTH CLAIM FOR RELIEF

### Fraudulent Concealment

### (By Plaintiffs Against Defendants On Behalf of the Class)

132.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

133.   Plaintiffs reasonably expected that Defendants would comply with the disclosures set forth in the mortgage agreement, Notes, Deeds of Trust, and Consent Decree and, as a result, Plaintiffs relied on Defendants' disclosures about the fees on their statements and on its website, reasonably believing the default-related service fees to be valid charges that were lawfully assessed and not marked-up.

134.   To avoid and prevent borrowers from challenging Defendants' unlawful fee assessments, Defendants concealed their scheme from borrowers by telling them, in statements and other documents, that such fees are in accordance with the terms of their mortgage.

135.   Had the true nature of the fees been disclosed to Plaintiffs and members of the Class, they would have been aware of the unlawful assessment of default-related property valuation fees and mark-ups, and Plaintiffs would have disputed the charges and not paid them.

136.   As a result of Defendants' fraudulent concealment, Plaintiffs and members of the Class have been injured in fact and suffered a loss of money or property.

Plaintiffs and members of the Class would have challenged the assessment of such fees on their accounts had it not been for Ocwen's concealment of material facts.

137.   Defendants concealed material facts, as discussed above, with knowledge of the effect of concealing of these material facts. Ocwen knew that by misleading consumers, they would generate more revenue and higher profits.

138.   Plaintiffs and members of the Class justifiably relied upon Defendants' knowing, affirmative, and active concealment. By concealing material information about their scheme to assess unlawful as well as marked-up default-related service fees on borrowers' accounts, Defendants intended to induce Plaintiffs and members of the Class into believing that they owed Ocwen money that it was not actually entitled to.

139.   Defendants acted with malice, oppression, or fraud, in that Defendants knew that the charged-for Default-Related Services were marked-up and/or misrepresented and nonetheless attempted to collect and did in fact collect said amounts from homeowners including Plaintiffs and members of the Class.

140.   As a direct and proximate result of Ocwen's omissions and active concealment of material facts, Plaintiff Rhodeman and each member of the Class has been damaged in an amount according to proof at trial.

## SIXTH CLAIM FOR RELIEF

### Money Had and Received (Restitution)

### (By Plaintiffs Against Defendants On Behalf of the Class)

141.   Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

142.   Plaintiffs and Class members conferred a financial benefit on Defendants, of which benefit Defendants had knowledge. Ocwen and Altisource received from Plaintiffs and Class members a benefit in the form of profits from their default-services scheme that resulted in payment of fees not incurred by Ocwen. By their wrongful acts and omissions described herein, Defendants were unjustly enriched at the expense of Plaintiffs and Class members.

143.  The detriment to Plaintiffs and Class members and Defendants' enrichment were related to and resulted from the wrongful conduct alleged in this Complaint.

144.  It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained from their wrongful conduct, as described herein, in connection with the default-related services.

145.  Plaintiffs and Class members seek restitution and/or damages from Defendants and/or an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. If necessary, the establishment of a constructive trust from which the California Plaintiff and Class members may seek restitution may be established.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract)

### (By Plaintiffs Against Defendant Ocwen Only on Behalf of the Class)

146.  Plaintiffs incorporate all preceding and succeeding allegations by reference as if fully set forth herein.

147.  The Deed of Trust is a valid, legal and/or enforceable contract to which Plaintiffs and Defendant Ocwen, as servicer, are parties.

148.  Plaintiffs and the Class members have standard form mortgage contracts that are similar in all material respects with respect to property valuations and inspections. At all relevant times, Ocwen was contractually obligated to service the loans of Plaintiffs and the Class pursuant to the terms of the mortgage contracts.

149.  To the extent the mortgage contracts of Plaintiffs and Class members permitted Ocwen to conduct and assess fees for property valuations and inspections, Ocwen was contractually permitted to do so only to the extent specified in the mortgage agreements.

150. Ocwen assumed the obligations of Plaintiffs' mortgage agreements, and the mortgage agreement of every other Class member, when it took over servicing of their mortgage agreements.

151. Plaintiffs satisfied their obligations under the mortgage agreement by making payments of principal and interest and have otherwise performed all of the obligations, covenants, and conditions required by the Deed of Trust.

152. Ocwen breached its contracts with Plaintiffs and other Class members by assessing charges not authorized under the mortgage agreements.  Specifically, Ocwen breached its mortgage contracts with Plaintiff and the Class members in at least the following respects:

    a.    Including in the debts of Plaintiff and the Class members costs for Default-Related Services that were not authorized to be incurred;

    b.    Including in the debts of Plaintiff and the Class members costs for default-related services that exceeded the "reasonable rate" of those services; and

    c.    Mispresenting the services that had been performed.

153. Ocwen knew or should have known that assessing charges not authorized was, and continues to be, a material breach of the mortgage agreements.

154. As a direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiffs and other members of the Class have suffered damage, financial loss and injury.

155. The conduct complained of is ongoing and unless enjoined will continue and continue to put Class members, including Plaintiffs, at risk of further damage.  A declaration of the parties' rights under the contracts is appropriate and sought.

156. By reason of the foregoing, Plaintiffs and each member of the Class are entitled to recover from Ocwen damages, restitution, injunctive relief, declaratory relief, the cost of bringing this action (including reasonable attorneys' fees and costs), and any other relief deemed just and equitable in the circumstances.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all those similarly situated, pray for relief and judgment against Defendants, jointly and severally, as follows:

A.      For an order certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and her undersigned counsel to represent the Class;

B.      For preliminary and permanent injunctive relief prohibiting Defendants from engaging in the wrongful practices alleged in this Complaint;

C.      For damages sustained by Plaintiffs and the Class;

D.      For restitution;

E.      For disgorgements of profits;

F.      For treble damages;

G.      For payment of reasonable attorneys' fees and costs pursuant to the "common fund" doctrine, statutory fee-shifting provisions, equitable principles of contribution, and/or any other applicable method of awarding attorneys' fees and costs in class actions;

H.      For payment of costs of suit incurred herein;

I.      For payment of prejudgment interest as provided by law; and,

J.      For any such further relief as this Court deems equitable, just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs seek a trial by jury for all appropriate issues on each and every claim for relief in this Complaint.

ZIMMERMAN REED LLP

Dated: November 5, 2018          By:      /s/ Christopher P. Ridout
                                                  Christopher P. Ridout
                                                  Benjamin Gubernick
                                                  Hannah B. Fernandez

---

COMPLAINT
35

2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
Tel. (877) 500-8780
Fax (877) 500-8781

David N. Lake
LAW OFFICES OF DAVID N. LAKE, APC
16130 Ventura Boulevard, Suite 650
Encino, CA 91436
Tel. (818) 788-5100
Fax (818) 479-9990

*Attorneys for Plaintiffs*